UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                                            :
MANMOHAN UTTARWAR,                                          :
                                                            :
                                        Plaintiff,          :       No. 1:22-CV-8139 (JMF)
                                                            :
                    - against -                             :
                                                            :
LAZARD ASSET MANAGEMENT LLC and                            :
KERI TUSA,                                                  :
                                                            :
                                        Defendants.         :
                                                            :
------------------------------------------------------------x


# DEFENDANTS' MEMORANDUM OF LAW IN
# SUPPORT OF MOTION FOR SUMMARY JUDGMENT


August 7, 2023

                              FRIEDMAN KAPLAN SEILER
                                ADELMAN & ROBBINS LLP
                              7 Times Square
                              New York, NY  10036-6516
                              (212) 833-1100

                              *Attorneys for Defendants*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF RELEVANT FACTS ............................................................................. 2

    A.    Plaintiff's Hiring at LAM ....................................................................... 2

    B.    Plaintiff's Performance Issues ............................................................... 3

    C.    LAM Approves Plaintiff's Request for Paid Parental Leave ................. 6

    D.    Plaintiff's Termination .......................................................................... 6

    E.    Plaintiff's Purported Job Search Efforts ............................................... 7

    F.    Plaintiff's Lawsuit ................................................................................. 7

    G.    John LaBadia's Employment at LAM .................................................... 8

I.    SUMMARY JUDGMENT SHOULD BE GRANTED ON PLAINTIFF'S
NYSHRL DISCRIMINATION CLAIMS AND FMLA RETALIATION CLAIM .......... 10

    A.    Plaintiff Cannot Prove a *Prima Facie* Claim of Discrimination ......... 12

        1.    There Is No Evidence of Discriminatory Intent ....................... 12

        2.    There Is No Evidence of Retaliatory Intent .............................. 14

    B.    The Undisputed Evidence Shows LAM Had Legitimate,
Non-Discriminatory Reasons to Terminate Plaintiff ............................. 15

    C.    There Is No Evidence That LAM's Reasons
for Terminating Plaintiff Were Pretextual ............................................ 17

II.    SUMMARY JUDGMENT SHOULD BE GRANTED ON PLAINTIFF'S
NYCHRL CLAIMS AND NYSHRL RETALIATION CLAIMS .................................. 18

    A.    Plaintiff's NYCHRL Discrimination Claims Fail as a Matter of Law ................. 18

    B.    Plaintiff's Retaliation Claims Fail as a Matter of Law ......................... 20

III.    SUMMARY JUDGMENT SHOULD BE GRANTED ON
PLAINTIFF'S HOSTILE WORK ENVIRONMENT CLAIMS ...................................... 21

IV.    SUMMARY JUDGMENT SHOULD BE GRANTED AS TO
PLAINTIFF'S CLAIMS FOR BACKPAY AND/OR FRONTPAY DAMAGES ............ 22

**Page**

CONCLUSION...........................................................................................................................25

4861-3463-2304.15

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abdu-Brisson v. Delta Air Lines, Inc.*,
239 F.3d 456 (2d Cir. 2001)................................................................................9

*Adams-Flores v. City of N.Y.*,
2023 WL 2266478 (S.D.N.Y. Feb. 28, 2023)..........................................10, 12, 19

*Arbercheski v. Oracle Corp.*,
650 F. Supp. 2d 309 (S.D.N.Y.2009)..................................................................23

*Baguer v. Spanish Broad. Sys., Inc.*,
2010 WL 2813632 (S.D.N.Y. July 12, 2010) .....................................................18

*Bickerstaff v. Vassar Coll.*,
196 F.3d 435 (2d Cir. 1999)..............................................................................11

*Broadnax v. City of New Haven*,
415 F. 3d 265 (2d Cir. 2005)..............................................................................23

*Broich v. Inc. Vill. of Southampton*,
462 F. App'x 39 (2d Cir. 2012) ..........................................................................13

*Bush v. Fordham Univ.*,
452 F. Supp. 2d 394 (S.D.N.Y. 2006)................................................................13

*Cardwell v. Davis Polk & Wardwell LLP*,
2023 WL 2049800 (S.D.N.Y. Feb. 16, 2023).........................................17, 22, 23

*Carlton v. Mystic Transp., Inc.*,
202 F.3d 129 (2d Cir. 2000)........................................................................16, 17

*Catanzaro v. City of N.Y.*,
2011 WL 335648 (S.D.N.Y. Jan. 25, 2011) .......................................................14

*Cooper v. N.Y. State Nurses Ass'n*,
847 F. Supp. 2d 437 (E.D.N.Y. 2012) ................................................................23

*Cruz v. Bernstein Litowitz Berger & Grossman LLP*,
2023 WL 2691456 (S.D.N.Y. Mar. 29, 2023)................................................11, 16

*Cunningham v. N.Y. Junior Tennis League, Inc.*,
2020 WL 916964 (S.D.N.Y. Feb. 26, 2020)........................................................11

*Dailey v. Societe Generale*,
108 F.3d 451 (2d Cir. 1997)..............................................................................23

*Davis-Molinia v. Port Auth. of N.Y. & N.J.*,
 2011 WL 4000997 (S.D.N.Y. Aug. 19, 2011).....................................................................21, 22

*Del Villar v. Hyatt Hotel Corp.*,
 2022 WL 2316205 (S.D.N.Y. June 28, 2022) ........................................................................10

*Delaney v. Bank of Am. Corp.*,
 766 F.3d 163 (2d Cir. 2014)....................................................................................................16

*Diggs v. Niagara Mohawk Power Corp.*,
 691 F. App'x 41 (2d Cir. 2017) ..............................................................................................13

*Ferraro v. N.Y. City Dep't of Educ.*,
 404 F. Supp. 3d 691 (E.D.N.Y. 2017) ....................................................................................22

*Fleming v. MaxMara USA, Inc.*,
 644 F. Supp. 2d 247 (E.D.N.Y. 2009) ....................................................................................22

*Giannone v. Deutsche Bank Sec., Inc.*,
 392 F. Supp. 2d 576 (S.D.N.Y. 2005).....................................................................................16

*Goenaga v. March of Dimes Birth Defects Found.*,
 51 F.3d 14 (2d Cir. 1995) ..........................................................................................................9

*Greenway v. Buffalo Hilton Hotel*,
 143 F.3d 47 (2d Cir. 1998).......................................................................................................23

*Grillo v. N.Y. City Transit Auth.*,
 291 F.3d 231 (2d Cir. 2002).....................................................................................................18

*Harewood v. N.Y.C. Dep't of Educ.*,
 2021 WL 673476 (S.D.N.Y. Feb. 22, 2021)......................................................................21, 22

*Harris v. NYU Langone Med. Ctr.*,
 2013 WL 3487032 (S.D.N.Y. July 9, 2013) ...........................................................................21

*Hawkins v. 1115 Legal Serv. Care*,
 163 F.3d 684 (2d Cir. 1998)..................................................................................................6, 23

*Hu v. UGL Servs. Unicco Operations Co.*,
 2014 WL 5042150 (S.D.N.Y. Oct. 9, 2014)...........................................................................6, 17

*James v. N.Y. Racing Ass'n*,
 233 F.3d 149 (2d Cir. 2000).....................................................................................................11

*Johnson v. Killian*,
 680 F.3d 234 (2d Cir. 2012)........................................................................................................9

*Kaye v. N.Y. City Health & Hosps. Corp.*,
 2023 WL 2745556 (S.D.N.Y. Mar. 31, 2023) ........................................................................19

iv

*Kirkland-Hudson v. Mount Vernon City Sch. Dist.*,
　2023 WL 2691622 (S.D.N.Y. Mar. 29, 2023) ........................................................12

*Lizardo v. Denny's, Inc.*,
　270 F.3d 94 (2d Cir. 2001) ....................................................................................18

*Lopez v. Chubb & Son*,
　2018 WL 4211324 (D. Conn. Sept. 4, 2018) ........................................................15

*Lulo v. OTG Mgmt., LLC*,
　2022 WL 409224 (S.D.N.Y. Feb. 10, 2022) ...................................................11, 14

*Mattera v. JPMorgan Chase Corp.*,
　740 F. Supp. 2d 561 (S.D.N.Y. 2010) ..................................................................14

*Maturine v. Am. Int'l Grp., Inc.*,
　2006 WL 2347806 (S.D.N.Y. Aug. 14, 2006) ......................................................10

*McLaughlin v. N.Y.*,
　2013 WL 3915183 (S.D.N.Y. July 30, 2013) .......................................................14

*McPherson v. N.Y. City Dep't of Educ.*,
　457 F.3d 211 (2d Cir. 2006) ..................................................................................17

*Mejia v. Roma Cleaning, Inc.*,
　751 F. App'x 134 (2d Cir. 2018) ...........................................................................14

*Mestecky v. N.Y. City Dep't of Educ.*,
　2018 WL 10509457 (E.D.N.Y. Mar. 30, 2018) ....................................................12

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*,
　2015 WL 13699239 (S.D.N.Y. Mar. 25, 2015) .....................................................23

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*,
　715 F.3d 102 (2d Cir. 2013) ............................................................................*passim*

*Modica v. N.Y. City Dep't of Educ.*,
　2021 WL 3408587 (S.D.N.Y. Aug. 4, 2021) ........................................................21

*Montgomery v. N.Y. City Transit Auth.*,
　2019 WL 1258482 (S.D.N.Y. Mar. 19, 2019) ......................................................17

*Ochoa v. Fed. Express Corp.*,
　2018 WL 3996928 (S.D.N.Y. Aug. 21, 2018) ......................................................13

*Ruiz v. Cnty. of Rockland*,
　609 F.3d 486 (2d Cir. 2010) ..................................................................................13

*Sivio v. Vill. Care Max*,
　436 F. Supp. 3d 778 (S.D.N.Y. 2020) ..................................................................20

*Smalls v. Amazon.com Servs. LLC*,
  2022 WL 356432 (E.D.N.Y. Feb. 7, 2022).............................................................13

*Smith v. City of N.Y.*,
  385 F. Supp. 3d 323 (S.D.N.Y. 2019).................................................................19

*Sosa v. Rockland Cty. Cmty. Coll.*,
  2017 WL 3105872 (S.D.N.Y. July 20, 2017) .......................................................11

*Sotomayor v. City of N.Y.*,
  862 F. Supp. 2d 226 (E.D.N.Y. 2012) ...............................................................14

*Staff v. Pall Corp.*,
  233 F. Supp. 2d 516 (S.D.N.Y. 2002).................................................................12

*Stuart v. T-Mobile USA, Inc.*,
  2015 WL 4760184 (S.D.N.Y. Aug. 12, 2015)................................................10, 12

*Syeed v. Bloomberg L.P.*,
  568 F. Supp. 3d 314 (S.D.N.Y. 2021)...........................................................10, 18

*Szewczyk v. Saakian*,
  774 F. App'x 37 (2d Cir. 2019) .........................................................................19

*Texas Dep't of Cmty. Affs. v. Burdine*,
  450 U.S. 248 (1981)..........................................................................................11

*Tomizawa v. ADT LLC*,
  2015 WL 5772106 (E.D.N.Y. Sept. 29, 2015) ....................................................20

*Vargas v. St. Luke's-Roosevelt Hosp. Ctr.*,
  2020 WL 2836824 (S.D.N.Y. June 1, 2020) .......................................................10

*Villar v. City of N.Y.*,
  135 F. Supp. 3d 105 (S.D.N.Y. 2015)...........................................................21, 22

*Vlahos v. Schroeffel*,
  2006 WL 544444 (E.D.N.Y. Mar. 6, 2006)........................................................15

*Weinstock v. Columbia Univ.*,
  224 F.3d 33 (2d Cir. 2000)..................................................................................9

*Woolf v. Bloomberg L.P.*,
  2019 WL 1046656 (S.D.N.Y. Mar. 5, 2019) ..................................................13, 15

*Ya-Chen Chen v. City Univ. of N.Y.*,
  805 F.3d 59 (2d Cir. 2015).................................................................................18

*Yoselovsky v. Assoc. Press*,
  917 F. Supp. 2d 262 (S.D.N.Y. 2013).................................................................16

*Young v. United Parcel Serv., Inc.*,
    575 U.S. 206 (2015)................................................................................................................11

**Rules**

Fed. R. Civ. P. 56(a) .................................................................................................................9

Local Civil Rule 56.1(a)............................................................................................................2

Defendants Lazard Asset Management LLC ("LAM") and Keri Tusa ("Tusa," and, together with LAM, "Defendants") respectfully submit this memorandum of law in support of their motion for summary judgment.

## PRELIMINARY STATEMENT

In September 2019, LAM terminated Plaintiff Manmohan Uttarwar's employment as part of a firm-wide reduction in force ("RIF"). His poor job performance was the reason he was selected for termination in the RIF. Nearly three years later, Plaintiff attempts to invoke federal, state, and New York City employment discrimination laws to transform his performance-based termination into a case of purported discrimination and retaliation, premised largely on his South Asian Indian descent. Plaintiff's claims—which he has shown little interest in litigating—all fail as a matter of law and the Court should grant summary judgment dismissing this case in its entirety.

*First*, there is there is no evidence suggesting Plaintiff's employment was terminated under circumstances that give rise to any inference of discriminatory or retaliatory intent. The evidence shows that Plaintiff's supervisor Tusa initially looked forward to "building a successful future together" with Plaintiff. In short order, however, serious work performance issues subsequently manifested and were documented, and Plaintiff's performance did not improve despite Defendants' good-faith remediation efforts.

*Second*, even assuming Plaintiff could establish a *prima facie* claim for discrimination (and he cannot), discovery has shown LAM had numerous legitimate and nondiscriminatory reasons for terminating Plaintiff's employment. In particular, both of Plaintiff's written performance evaluations during the nine months preceding his termination were highly negative, and in all events occurred well before Plaintiff's alleged protected activities. Plaintiff's performance problems ultimately led Tusa and LAM's then-Chief

Technology Officer, who is a member of the same protected class as Plaintiff, to select him for termination as part of the RIF, which impacted more than 50 LAM employees in total. The RIF itself is, of course, a second, independent nondiscriminatory reason for Plaintiff's termination, and there is no evidence that LAM's stated reasons for terminating Plaintiff were pretextual. Plaintiff's municipal-law claims for discrimination, retaliation and hostile work environment also fail for these same reasons and others.

*Third*, even if there were material issues of fact which could warrant a trial, the uncontradicted evidence shows Plaintiff failed to mitigate any of his alleged damages. Among other things, he has consistently and unreasonably restricted his job search to only those employment opportunities that promised seven-figure compensation, which would have been a *multiple* of what he was paid at LAM, or the title of Chief Technology Officer or Chief Information Officer, which are positions he never held at LAM or anywhere else. These undisputed facts require summary judgment as to Plaintiff's claim for damages.

## STATEMENT OF RELEVANT FACTS[1]

### A.   Plaintiff's Hiring at LAM

On April 23, 2018, LAM offered Plaintiff the position of Senior Vice President, Senior Trading Technology Engineer (56.1 ¶ 5), and he began employment at LAM on May 14, 2018. (56.1 ¶ 9.) LAM's Chief Technology Officer Vijay Kasarabada was the hiring manager who led the recruitment efforts for Plaintiff's position. (56.1 ¶ 6.) On June 18, 2018, Plaintiff began reporting to Defendant Tusa, who was Global Head of Trading Technology at the time. (56.1 ¶ 2.) Shortly after Plaintiff began reporting to Tusa, she emailed Plaintiff stating she looked "forward to getting to know [Plaintiff] better and building a successful future together."

---

[1] Citations to "56.1 ¶" refer to Defendants' Local Civil Rule 56.1(a) Statement of Material Facts in Support of Motion for Summary Judgment (ECF No. 49).

(56.1 ¶ 14.)  Plaintiff testified that a few months after Plaintiff started work at LAM, Tusa approved his request for a vacation to travel to India to spend time with his parents during the Hindu festival of Diwali.  (56.1 ¶ 15.)

**B.    Plaintiff's Performance Issues**

Within months after Plaintiff's employment at LAM began, serious performance issues began to manifest themselves, which were documented in his 2018 year-end performance review.  (56.1 ¶¶ 17-22.)  Tusa rated Plaintiff "Below Expectations"—the lowest possible score—in all performance assessment categories.  (56.1 ¶¶ 18-19.)  Among other things, the review criticized Plaintiff's habit of talking down to other employees in group meetings.  It stated Plaintiff should "be thoughtful as to whether or not he can add additional insight, and when another [meeting] attendee has adequately explained the issue," because restatement could lead to a "situation [where] people are a bit irritated, as they already understood it in the first place."  (56.1 ¶ 20.)  In her 2018 year-end review of Plaintiff, Tusa stated that she needed "to see execution from start to finish on tasks" assigned to Plaintiff and that he should "select and solve for 2-3 key issues, before spending time engaging with every team."  (56.1 ¶ 21.)

Yet Plaintiff's performance did not improve.  In his 2019 mid-year review, which was submitted in June 2019, Tusa described at some length Plaintiff's failures to meet expectations, as follows:

> Manmohan submitted 30 projects in his self-review. I asked him repeatedly, starting months ago, to share his project list. **This was never done.**
>
> The fact that he created these 30 projects (most of which I do not agree qualify as projects), without sharing these with me or discussing with me at any time, is a perfect example of the constant challenges and ongoing disconnect.
>
> In reviewing the 30 projects listed:
>
> *5 are Support*

3

1,2,3: These are normal, ongoing support and are handled by the whole Fixed Income team. Each team reporting to me has this ongoing BAU, and these are not projects.

14, 15: Providing data to auditors is a recurring task performed by all teams

### 5 are Required Upgrades

7,8,28,29: These are MQ upgrades. LAM employs a consultant who assists with all MQ upgrades and works which each of my teams who use MQ messaging - L TH, Equity, Compliance, and Fixed Income and representatives from each of these teams worked with the consultant as part of these upgrades.

30: Required upgrades of database and Windows servers are performed by all technology teams. All members of the Fixed Income team assist with upgrades.

### 3 are Annual Business Continuity and Disaster Recovery

16, 17: BCP and DR are performed by all of the technology teams. **Manmohan was the one member of my team who did not report the results of his test to me by the cutoff time.** The Equity trading, Compliance, LTH teams, and the other Fixed Income team member all reported results in a timely fashion. After the cutoff, I called Manmohan on his cell phone and informed him that the LAM IT results were being held up pending his response. He said he was in the middle of dinner with friends and would get back to me afterward.

26: Whenever a BCP or DR test fails, we follow-up with a re-test/resolution. Manmohan organized one retest as a result of a failure in the 2018 DR. To give context, this year LAM IT has 25 DR items that require follow up. This would be 1 of 25. All teams across IT organize re-testing as needed for their applications

### 3 Incomplete/does not work/work done by others

13: After Joe Ramos asked Manmohan for internal help to find a solution for data limits. **Manmohan reached out to Bloomberg for help, and as a result of conversations he initiated with Bloomberg - including after Joe asked him to cease communication, Bloomberg is performing an audit of the team's data usage.** Joe and I have had to be on numerous calls subsequently to work with Bloomberg to try to resolve this issue created.

**24: Automated security setup for ADR/GDR was not successful, and pricing logic was not determined, much less implemented or rolled**

4

**out.** This is being urgently requested and is necessary as part of the Portia decom.

19: **I originally asked Manmohan to run point on the VAT tax. Ultimately, due to inaction, this was taken over by myself and 2 other developers** (who do not report to him).

Of the other 14 items, the general theme is requirement gathering, user interaction, drafting of strategy which is the bulk of the work. While this is appreciated, that's not the job description for the role, and it's not what I am expecting. Simply listing out items does not make them "projects".

**I asked Manmohan at many of our catch-ups to provide a project list. He is the only lead who did not.** The last time I raised this back in June, he said that he had "48 or 49 projects and would not provide a list until I discussed each one with him, individually. Otherwise it would be a list of bullet points and would not have context." I assured him that would be sufficient, and to use Jira, Excel, or simply an email. This "project" list is the very first list I have seen.

As per previous discussions, **the role Manmohan was hired for involves writing code, building product, and designing solutions for our users.** I would have expected him to complete the automated security setup, to progress on Joe Ramos' migration project (which stalled after an incomplete delivery of phase 1; this project kicked off one year ago), to work on the Real Time P&L project (initial meetings, draft architecture/design were not done), all pending for many months. **Separately, there are always many fires I have to fight after I have asked Manmohan to interact with both internal users and external vendors.**

-----------------------------------------------------------------------------

On the job description for Manmohan's role, the responsibilities include:

Creating architectural design and full-stack development

-> **He has not checked in code, released new projects, or developed applications**

Collaborating with business stakeholders to design application solutions to meet their emerging requirements

-> **I have received complaints from business stakeholders across many areas (Portfolio Management, Operations, Legal) about Manmohan's overcomplication of even the most straight-forward of issues**

5

Analyzing existing systems and workflows to identify inefficiencies and offer solutions for improvement

-> **Manmohan will begin tasks with enthusiasm, but is quick to deflect/finger-point when any challenges are met.** This occurs with vendors and also members of his own team

Design/Develop/Deploy/Support applications independently using Agile methodology

-> **I have repeatedly asked Manmohan to roll up his sleeves and write code. There's been 0% execution on this.**

(56.1 ¶¶ 23-28 (emphasis added).)

Following the 2019 mid-year review, contemporaneous documentation shows that as early as July 2019, LAM was considering terminating Plaintiff's employment. (56.1 ¶ 22.)

### C.  LAM Approves Plaintiff's Request for Paid Parental Leave

While not required by any law to do so, LAM offers its employees paid parental leave, and, as permitted under the Family Medical Leave Act ("FMLA"), LAM requires that employees take any unpaid FMLA parental leave concurrently with any paid leave. (56.1 ¶ 36.) On August 16, 2019, Plaintiff requested and was granted 20 weeks of paid parental leave. (56.1 ¶ 40.)

### D.  Plaintiff's Termination

On September 25, 2019, while Plaintiff was on his parental leave, LAM informed Plaintiff his employment at LAM was terminated as part of the RIF. That RIF involved the termination of more than 50 LAM employees in total, including three other IT employees. (56.1 ¶¶ 41-42.) Tusa and Kasarabada selected Plaintiff for termination in the RIF because of his poor performance. (56.1 ¶¶ 43.)

LAM initially offered Plaintiff a severance payment consistent with the firm's severance formula for the 2019 RIF, and which also included payment of his salary through October 29, 2019, the scheduled end date of his parental leave. (56.1 ¶ 47.) Over a 21-month

period that started on November 8, 2019, Plaintiff sent more than twenty emails to LAM's Human Resources department seeking a larger severance payment. (56.1 ¶ 48.) In none those emails did Plaintiff suggest that anyone at LAM had discriminated or retaliated against him. (56.1 ¶ 49.) Plaintiff ultimately did not accept any severance offered by LAM. (56.1 ¶ 48.)

**E.      Plaintiff's Purported Job Search Efforts**

Plaintiff's highest annual salary at LAM was $200,000, and he received bonuses totaling $120,000 for 2018. (56.1 ¶¶ 5, 7.) During Plaintiff's purported job search after his termination, he told more than a dozen recruiters he was not interested in any position with compensation less than seven figures. (56.1 ¶ 55.)

Plaintiff was hired at LAM for the position of Senior Vice President, Senior Trading Technology Engineer, (56.1 ¶ 1), and he has never held the title of Chief Information Officer or Chief Technology Officer at LAM or anywhere else. (56.1 ¶ 13.) In his post-LAM job search, however, Plaintiff told recruiters again and again that he was not interested in any positions other than "executive leadership" roles such as Chief Information Officer or Chief Technology Officer. (56.1 ¶ 13.)

For example, on June 13, 2022, nearly three years after his termination and having been unemployed all that time, Plaintiff received an email from a recruiter regarding a Manager of Application Development position which stated, "[t]hey'll pay anywhere up to 400-500 K total compensation for the right candidate." (56.1 ¶ 57.) Plaintiff responded that he was "[l]ooking for a total comps in 7-Figures only," which the recruiter responded was "too high" for the position. (56.1 ¶ 57.

**F.      Plaintiff's Lawsuit**

On September 23, 2022, over three years after his termination date, Plaintiff filed the complaint in this action, asserting fourteen causes of action:

- Counts 1, 3, and 14: Unlawful discrimination based on national origin and race, religious, and familial status under the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296 (the "NYSHRL Discrimination Claims").  (Compl. ¶¶ 72-77, 84-89, 148-153 (ECF No. 1).)

- Count 6: Unlawful retaliation for requesting leave pursuant to the Family and Medical Leave Act ("FMLA") (the "FMLA Retaliation Claim"). (Compl. ¶¶ 102-107.)

- Count 7: Unlawful retaliation for complaining about discriminatory treatment in violation of the NYSHRL (the "NYSHRL Retaliation Claim").  (Compl. ¶¶ 108-112.)

- Counts 2, 4, 5, and 13: Unlawful discrimination on the basis of national origin and race, religion, disability, and caregiver status, in violation of the New York City Human Rights Law ("NYCHRL") (the "NYCHRL Discrimination Claims").  (Compl. ¶¶ 78-83, 90-101, 142-147.)

- Count 8: Unlawful retaliation for complaining about discriminatory treatment, in violation of the NYCHRL (the "NYCHRL Retaliation Claim," collectively with the NYCHRL Discrimination Claims, the "NYCHRL Claims.").  (Compl. ¶¶ 113-117.)

- Counts 9 and 11: Hostile work environment based on religion, and national origin and race, in violation of the NYCHRL (the "NYCHRL Hostile Work Environment Claims").  (Compl. ¶¶ 118-122, 128-136.)

- Counts 10 and 12: Hostile work environment based on religion, and national origin and race, in violation of the NYSHRL (the "NYSHRL Hostile Work Environment Claims" collectively with the NYCHRL Hostile Work Environment Claims, the "Hostile Work Environment Claims").  (Compl. ¶¶ 123-127, 137-141.)

In this action, Plaintiff seeks total damages of over $1,000,000 (56.1 ¶ 50),

including $948,333.05 in backpay and/or frontpay, allegedly based on his compensation at LAM,

measured from September 25, 2019 to the present.  (56.1 ¶ 51.)

## G.    John LaBadia's Employment at LAM

Plaintiff's claims depend in substantial part on his allegation that he was similarly

situated to a colleague, John LaBadia, but was treated disparately.  (Compl. ¶¶ 31-47.)  LaBadia

was a Senior Vice President at LAM during the time Plaintiff was employed there.  (56.1 ¶ 4.)

8

LaBadia began working at LAM more than a decade before Plaintiff, in 2003.  (56.1 ¶ 70.)  Like Plaintiff, LaBadia reported to Tusa.  (56.1 ¶ 4.)  At the time of Plaintiff's termination, LaBadia supervised three LAM employees, and Plaintiff did not supervise any.  (56.1 ¶ 62.)  LaBadia received positive 2018 end-of-year and 2019 mid-year reviews.  (56.1 ¶¶ 63-64.)  LaBadia also provided a list of ongoing projects to Tusa when requested and followed Tusa's instructions regarding prioritization of projects.  (56.1 ¶¶ 65, 68.)  LaBadia regularly contributed to the LAM Technologies department by producing working code, completing assigned projects, and developing applications at the request of LAM users.  (56.1 ¶ 69.)  Tusa did not receive complaints about LaBadia from internal or external LAM stakeholders.  (56.1 ¶¶ 66-67.)

## **ARGUMENT**

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012).  "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim."  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).

Summary judgment may be appropriate "even in the fact-intensive context of discrimination cases."  *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).  Where a defendant puts forth evidence of legitimate, non-discriminatory reasons for an adverse employment action, a "plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action."  *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000).

9

"[A] party who . . . fails to use the time available [to conduct discovery cannot] simply claim[] that the declaration submitted in support of the summary judgment is not credible." *Maturine v. Am. Int'l Grp., Inc.*, 2006 WL 2347806, at *4 (S.D.N.Y. Aug. 14, 2006) (internal citation and quotation marks omitted); *see also Vargas v. St. Luke's-Roosevelt Hosp. Ctr.,* 2020 WL 2836824, at *9 (S.D.N.Y. June 1, 2020) ("if Vargas wishes to suggest that his former co-workers' sworn statements were inaccurate because those co-workers were unable to remember what occurred two years ago, he could have deposed [them]").

**I.**
**SUMMARY JUDGMENT SHOULD BE GRANTED ON PLAINTIFF'S**
**NYSHRL DISCRIMINATION CLAIMS AND FMLA RETALIATION CLAIM**

All of Plaintiff's claims other than his Hostile Work Environment Claims are assessed under the burden shifting framework set forth in *McDonnell-Douglas* and its progeny. *See Adams-Flores v. City of N.Y.*, 2023 WL 2266478, at *7 (S.D.N.Y. Feb. 28, 2023) (NYSHRL discrimination and retaliation claims) (Furman, J.); *Stuart v. T-Mobile USA, Inc.*, 2015 WL 4760184, at *5, *8 (S.D.N.Y. Aug. 12, 2015) (FMLA retaliation and NYCHRL claims) (Furman, J.).[2]

"Under th[e] [*McDonnell-Douglas*] framework, Plaintiff has 'the initial burden of establishing a prima facie case of discrimination.'" *Stuart*, 2015 WL 4760184, at *5 (citation omitted). To do so, a plaintiff "must show that: (1) he was a member of a protected class; (2) he was competent to perform the job in question or was performing the job duties satisfactorily; (3)

---

[2] The NYSHRL was amended effective August 12, 2019 to more closely track the NYCHRL's more lenient liability standard. *See Del Villar v. Hyatt Hotel Corp.*, 2022 WL 2316205, at *4 (S.D.N.Y. June 28, 2022) (Furman, J.). Plaintiff's NYSHRL Discrimination Claims are assessed together with his FMLA Retaliation Claim because they are based on alleged conduct that occurred prior to that date. *See id.* (NYSHRL amendment was not retroactive). However, Plaintiff's NYSHRL Retaliation Claim is based on his September 2019 termination, and thus is assessed with his NYCHRL Claims, *see infra* Section II. *See Syeed v. Bloomberg L.P.*, 568 F. Supp. 3d 314, 321 (S.D.N.Y. 2021) (applying pre-2019 NYSHRL analysis to alleged discriminatory conduct before the effective date of the amendment and post-2019 NYSHRL analysis to alleged discriminatory conduct after the effective date of the amendment).

he suffered a materially adverse employment action; and (4) the action occurred under circumstances that give rise to an inference of discrimination" or retaliatory intent. *See Cunningham v. N.Y. Junior Tennis League, Inc.*, 2020 WL 916964, at *3 (S.D.N.Y. Feb. 26, 2020) (Furman, J.); *Lulo v. OTG Mgmt., LLC*, 2022 WL 409224, at *8 (S.D.N.Y. Feb. 10, 2022). "An inference is not a suspicion or a guess.  It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact [that is known to exist]." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999).

If a plaintiff carries this burden, the [*McDonnell-Douglas*] framework dictates that "the employer must have an opportunity 'to articulate some legitimate, non-discriminatory reason[s] for' the difference in treatment." *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 206 (2015) (citation omitted).  "Courts in this Circuit routinely find that evidence indicating unsatisfactory work performance by the plaintiff is sufficient to establish a legitimate, non-discriminatory reason for an adverse employment action." *Cruz v. Bernstein Litowitz Berger & Grossman LLP*, 2023 WL 2691456, at *8 (S.D.N.Y. Mar. 29, 2023) (collecting cases).

When a defendant articulates a legitimate non-discriminatory reason for its adverse employment action, the *McDonnell-Douglas* framework then shifts the burden to the plaintiff to "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981).  "Evidence 'contradicting the employer's given reason—without more—does not necessarily give logical support to an inference of discrimination,' and is therefore insufficient to satisfy plaintiff's burden." *Sosa v. Rockland Cty. Cmty. Coll.*, 2017 WL 3105872, at *5 (S.D.N.Y. July 20, 2017) (quoting *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000)).

11

Plaintiff's claims for (i) discrimination on the basis of race, national origin, religion and familial status and (ii) retaliation on the basis of his use of FMLA leave fail at each stage of the *McDonnell-Douglas* analysis.

**A.      Plaintiff Cannot Prove a *Prima Facie* Claim of Discrimination**

Under all of the statutes under which Plaintiff sues, a *prima facie* claim of discrimination requires proof of something that qualifies as an adverse employment action. *See Adams-Flores*, 2023 WL 2266478 at *7; *Stuart*, 2015 WL 4760184, at *5, *8.

Failure to provide an employee with subordinates or an office does not constitute an adverse employment action for such purposes. *See Staff v. Pall Corp.*, 233 F. Supp. 2d 516, 532 (S.D.N.Y. 2002) (no adverse employment action where no evidence that plaintiff needed an office or subordinate to fulfill his job responsibilities), *aff'd*, 76 F. App'x 366 (2d Cir. 2003). Nor is excluding an employee from meetings or giving them a negative review. *See Kirkland-Hudson v. Mount Vernon City Sch. Dist.*, 2023 WL 2691622, at *23 (S.D.N.Y. Mar. 29, 2023) (exclusion from meetings); *Mestecky v. N.Y. City Dep't of Educ.*, 2018 WL 10509457, at *15 n.6 (E.D.N.Y. Mar. 30, 2018) (negative evaluations), *aff'd*, 791 F. App'x 236 (2d Cir. 2019).

Accordingly, other than his termination, none of the actions of which Plaintiff complains constitutes an adverse employment action. (*See* Compl. ¶¶ 51-53, 55-57 (excluded from meetings); *id.* ¶ 50 (had subordinate removed from his supervision); *id.* ¶ 61 (not provided an office), *id.* ¶¶ 48, 59 (received negative reviews).)

**1.      There Is No Evidence of Discriminatory Intent**

Moreover, even if Plaintiff could establish the other elements of a claim for discrimination, discovery has produced no evidence that could possibly raise an inference of discriminatory intent, whether through purported disparate treatment or otherwise.

"To raise an inference of discrimination by showing that he was subjected to disparate treatment, the plaintiff must establish that he was 'similarly situated in all material respects' to the individuals with whom he seeks to compare himself." *Diggs v. Niagara Mohawk Power Corp.*, 691 F. App'x 41, 43 (2d Cir. 2017) (citation omitted). "An employee is similarly situated to co-employees if they were (1) 'subject to the same performance evaluation and discipline standards' and (2) 'engaged in comparable conduct.'" *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 493–94 (2d Cir. 2010). "[A] court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met." *Broich v. Inc. Vill. of Southampton*, 462 F. App'x 39, 42 (2d Cir. 2012) (summary order); *see also Ochoa v. Fed. Express Corp.*, 2018 WL 3996928, at *3 (S.D.N.Y. Aug. 21, 2018) ("Without admissible evidence of disparate treatment, there is no evidence in the record whatsoever suggesting that [plaintiff] was discriminated against.") (Furman, J.).

Employees at differing levels of seniority are not similarly situated. *See Bush v. Fordham Univ.*, 452 F. Supp. 2d 394, 410 (S.D.N.Y. 2006). Supervisors and managers that have subordinates or direct or indirect reports are not similarly situated to employees that do not. *See Smalls v. Amazon.com Servs. LLC*, 2022 WL 356432, at *6 (E.D.N.Y. Feb. 7, 2022). Employees that receive negative performance reviews are not similarly situated to employees that receive positive performance reviews. *See Woolf v. Bloomberg L.P.*, 2019 WL 1046656, at *19 (S.D.N.Y. Mar. 5, 2019), *aff'd*, 792 F. App'x 143 (2d Cir. 2020).

Plaintiff alleges he was similarly situated to, and treated disparately from, his coworker LaBadia. (Compl. ¶¶ 31-47.) The record shows Plaintiff was *not* similarly situated to LaBadia by any measure. First, LaBadia began working at LAM *fifteen years* before Plaintiff, and thus was far senior. (56.1 ¶ 70.) Second, LaBadia supervised LAM employees, and Plaintiff

13

did not.  (56.1 ¶ 62.)  Third, LaBadia received positive 2018 year-end and 2019 mid-year reviews, while Plaintiff did not.  (56.1 ¶¶ 17-28, 63-64.)

The record also shows (i) Tusa did not receive complaints about LaBadia, while she did receive them regarding Plaintiff, (56.1 ¶¶ 25, 66-67); (ii) LaBadia followed Tusa's instructions regarding prioritization of projects and gave Tusa a list of ongoing projects when asked to, while Plaintiff did neither, (56.1 ¶¶ 29-37, 65, 68); and (iii) LaBadia regularly produced source code, released projects, and developed applications, while Plaintiff did not.  (56.1 ¶¶ 26, 69.)  To the contrary, the only reasonable inference that could be drawn from the evidence here is that Plaintiff's performance led to his termination.  *See McLaughlin v. N.Y.*, 2013 WL 3915183, at *7 (S.D.N.Y. July 30, 2013) (plaintiff not similarly situated to other employee where plaintiff gossiped about other employees and had a contentious relationship with her supervisor and other employee did not).

### 2. There Is No Evidence of Retaliatory Intent

Evidence of retaliatory intent is necessary to Plaintiff's claim that he was terminated in retaliation for taking FMLA leave.  *Lulo*, 2022 WL 409224 at *8.

The "FMLA is not a shield to protect employees from legitimate disciplinary action by their employers if their performance is lacking in some manner unrelated to their FMLA leave."  *Mejia v. Roma Cleaning, Inc.*, 751 F. App'x 134, 137 (2d Cir. 2018) (citation omitted).  In particular, there can be no inference of retaliatory intent where an employee began receiving negative performance evaluations *prior to* any alleged protected activity.  *See Sotomayor v. City of N.Y.*, 862 F. Supp. 2d 226, 263 (E.D.N.Y. 2012), *aff'd*, 713 F.3d 163 (2d Cir. 2013); *see also Catanzaro v. City of N.Y.,* 2011 WL 335648, at *7 (S.D.N.Y. Jan. 25, 2011) (plaintiff cannot rely on temporal proximity to show inference of retaliation where he was "demonstrably at risk" of adverse employment action prior to protected activity); *Mattera v.*

*JPMorgan Chase Corp.*, 740 F. Supp. 2d 561, 582 (S.D.N.Y. 2010) (similar).  It is undisputed

that Plaintiff received negative performance evaluations in December 2018 and June 2019,

months before he requested (and was granted) FMLA leave in August 2019.  (*See* 56.1 ¶¶ 17-28,

38-40.)  Indeed, the evidence shows that LAM considered terminating Plaintiff's employment as

early as July 2019, a month before his August 16, 2019 request for FMLA leave.  (56.1 ¶ 22.)

Moreover, an employer's approval of a plaintiff's request for FMLA leave cuts

against an inference of retaliatory intent.  *See Woolf v. Bloomberg L.P.*, 2019 WL 1046656, at

*19 (S.D.N.Y. Mar. 5, 2019), *aff'd*, 792 F. App'x 143 (2d Cir. 2020); *see also Lopez v. Chubb &

Son*, 2018 WL 4211324, at *7 n.7 (D. Conn. Sept. 4, 2018) ("the purported temporal overlap

between [plaintiff's] usage of FMLA leave and h[is] termination also does not help h[is] case

given the fact that [defendants] approved h[is] use of FMLA leave") (citation and quotation

marks omitted).  Here, LAM both approved Plaintiff's request for 20 weeks of parental leave,

and, when his employment was terminated on September 25, 2019, agreed to pay him through

the scheduled conclusion of that leave on October 29, 2019.  (56.1 ¶ 47.)[3]  These undisputed

facts further compel summary judgment in favor of Defendants here.

**B.    The Undisputed Evidence Shows LAM Had Legitimate,
        Non-Discriminatory Reasons to Terminate Plaintiff**

Even if Plaintiff could establish a *prima facie* case of discrimination (which he

cannot), his claims fail at the second step of the *McDonnell-Douglas* framework because the

undisputed evidence shows LAM had multiple legitimate and non-discriminatory reasons for

terminating him.

---

[3] LAM offers an employee who is the primary caregiver of a newborn 20 weeks of *paid* parental leave in lieu of the unpaid leave available under the FMLA.  (56.1 ¶ 39.)  "[A]n employer . . . may require that [an] employee use his FMLA leave entitlement and his paid sick leave concurrently."  *Vlahos v. Schroeffel*, 2006 WL 544444, at *4 (E.D.N.Y. Mar. 6, 2006).  LAM requires that employees who qualify for paid parental leave also take unpaid FMLA leave concurrently.  (56.1 ¶ 39.)

"Courts in this Circuit routinely find that evidence indicating unsatisfactory work performance by the plaintiff is sufficient to establish a legitimate, non-discriminatory reason for an adverse employment action." *Cruz*, 2023 WL 2691456, at \*8.  For example, poor work product, lack of responsiveness, and inattentiveness to deadlines have been recognized as legitimate, non-discriminatory reasons for an adverse employment action such as termination. *See Yoselovsky v. Assoc. Press*, 917 F. Supp. 2d 262, 275-76 (S.D.N.Y. 2013); *see also Giannone v. Deutsche Bank Sec., Inc.*, 392 F. Supp. 2d 576, 588 (S.D.N.Y. 2005) ("It is widely acknowledged that reasons such as low productivity and conflicts with persons in positions of authority constitute legitimate nondiscriminatory reasons justifying discharge.") (citation omitted).  Independent of any performance issues, a RIF also "constitutes a legitimate, nondiscriminatory reason for termination of employment." *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014); *see also Carlton v. Mystic Transp.*, Inc., 202 F.3d 129, 136 (2d Cir. 2000) (to survive summary judgment, plaintiff must establish "that the reduction-in-force and the allegation of poor performance are actually a pretext").

The undisputed evidence shows that Plaintiff's poor performance resulted in two written negative performance reviews.  (56.1 ¶¶ 17-28.)  The first occurred approximately ten months before Plaintiff's termination and well before any alleged protected activities.  (56.1 ¶¶ 17-22.)  This alone proves that LAM had legitimate and non-discriminatory reasons for terminating Plaintiff.  What is more, the evidence shows that Plaintiff's termination occurred as part of a RIF that impacted more than 50 LAM employees, including three others within the IT group of which Plaintiff was a part, (56.1 ¶ 42), and he was selected for termination based on his documented poor performance.  (56.1 ¶ 43.)

**C.    There Is No Evidence That LAM's Reasons
<u>for Terminating Plaintiff Were Pretextual</u>**

"In a discrimination case, . . . we are decidedly not interested in the truth of the
allegations against plaintiff. We are interested in what 'motivated the employer.'" *McPherson
v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006) (citation omitted). A plaintiff's
"disagreement with Defendants' evaluation of his performance and decision to terminate him is
insufficient to establish pretext." *Cardwell v. Davis Polk & Wardwell LLP*, 2023 WL 2049800,
at *21 (S.D.N.Y. Feb. 16, 2023); *see also Hu v. UGL Servs. Unicco Operations Co.*, 2014 WL
5042150, at *6 (S.D.N.Y. Oct. 9, 2014) ("Plaintiff's own view of his work performance, without
more, is insufficient to demonstrate pretext.").

Accordingly, Plaintiff cannot rely on his own views about his performance, much
less a dispute over the validity of LAM's performance concerns (*see* Compl. ¶¶ 42-44, 49, 59-
60), to survive summary judgment—particularly given the documented record of Plaintiff's work
performance issues. Nor can Plaintiff rely on his own view of his qualifications to establish
pretext. "Where a plaintiff seeks to prevent summary judgment by relying on a discrepancy in
qualifications ignored by an employer, 'that discrepancy must bear the entire burden of allowing
a reasonable trier of fact to not only conclude the employer's explanation was pretextual, but that
the pretext served to mask unlawful discrimination.'" *Montgomery v. N.Y. City Transit Auth.*,
2019 WL 1258482, at *4 (S.D.N.Y. Mar. 19, 2019) (Furman, J.), *aff'd*, 806 F. App'x 27 (2d Cir.
2020).

Lastly, "[w]hen the same actor hires a person already within the protected class,
and then later fires that same person, 'it is difficult to impute to her an invidious motivation that
would be inconsistent with the decision to hire.'" *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129,
137 (2d Cir. 2000) (citation omitted). Moreover, "Courts draw an inference against

17

discrimination where the person taking the adverse action is in the same protected class as the effected employee." *Baguer v. Spanish Broad. Sys., Inc.*, 2010 WL 2813632, at *11 (S.D.N.Y. July 12, 2010), *aff'd*, 423 F. App'x 102 (2d Cir. 2011) (summary order). The fact that Kasarabada—himself a member of some of the same protected classes upon which Plaintiff's discrimination claims are based—was involved both in Plaintiff's hiring in May 2018 and the decision to terminate him in September 2019 cuts further against any inference of pretext. (*See* 56.1 ¶¶ 3, 6, 44.) Plaintiff has "done little more than cite to [his alleged] mistreatment and ask the court to conclude that it must have been related to [his membership in a protected class]. This is not sufficient." *Grillo v. N.Y. City Transit Auth.*, 291 F.3d 231, 235 (2d Cir. 2002) (quoting *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 104 (2d Cir. 2001)).

**II.**
**SUMMARY JUDGMENT SHOULD BE GRANTED ON**
**PLAINTIFF'S NYCHRL CLAIMS AND NYSHRL RETALIATION CLAIMS**

Plaintiff brings discrimination claims under the NYCHRL asserting he was discriminated against on the basis of his race, national origin, religion, disability association, and caregiver status (Counts 2, 4, 5, and 13), as well as claims under the NYSHRL and the NYCHRL, alleging he was terminated in retaliation for complaining about alleged discriminatory treatment (Counts 7 and 8).

NYCHRL claims and post-August 2019 NYSHRL claims must be analyzed separately and independently from any federal claims. *See Syeed v. Bloomberg L.P.*, 568 F. Supp. 3d 314, 321 (S.D.N.Y. 2021) (post-August 2019 NYSHRL claims); *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013) (NYCHRL). "[S]ummary judgment is appropriate" where "the record establishes as a matter of law that discrimination . . . played no role in the [Defendants'] actions." *Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 76 (2d Cir. 2015) (affirming granting of summary judgment on NYCHRL

claims). While this is a highly lenient standard, "a plaintiff still must show that the complained-of conduct is caused by a discriminatory motive." *Adams-Flores v. City of N.Y.*, 2023 WL 2266478, at *3 (S.D.N.Y. Feb. 28, 2023) (Furman, J.)). Plaintiff cannot do so.

A.    **Plaintiff's NYCHRL Discrimination Claims Fail as a Matter of Law**

        Where there is no evidence that discrimination played any role in an employer's treatment of the plaintiff, summary judgment can and should be granted on a discrimination claim under the NYCHRL. *See Szewczyk v. Saakian*, 774 F. App'x 37, 40 (2d Cir. 2019) (affirming summary judgment on NYCHRL national origin and religion discrimination claims where Plaintiff "offered no evidence to show that" Defendants' articulated reasons for adverse employment actions were "a pretext for discrimination"); *Kaye v. N.Y. City Health & Hosps. Corp.*, 2023 WL 2745556, at *21 (S.D.N.Y. Mar. 31, 2023) (granting summary judgment as to NYCHRL claims where "Plaintiff has produced no evidence that her caregiver status motivated Defendants' treatment of Plaintiff"); *Smith v. City of N.Y.*, 385 F. Supp. 3d 323, 342 (S.D.N.Y. 2019) (granting summary judgment on NYCHRL race discrimination claim where plaintiff "offered no evidence that raises a reasonable inference that any of Defendants' actions were motivated by an intent to discriminate on the basis of race").

        Discovery has produced no evidence of disparate treatment or anything else that could give rise to an inference of Defendants' discriminatory intent. In particular, there is no evidence that any LAM employee with a performance record similar to Plaintiff's was treated better or otherwise differently than Plaintiff. *See supra* Section I.A. Nor is there any evidence of any discriminatory statement or action by LAM or any of its employees. Rather, the undisputed evidence shows exactly the opposite. Among other things, Plaintiff testified that his supervisor, Tusa, approved his request for a vacation to travel to India to celebrate the Hindu festival of Diwali with his family, and expressed at the start of their working relationship that she looked

19

forward to "building a future together with" Plaintiff. (56.1 ¶¶ 14-15.)  And Kasarabada, who was involved in the decision to terminate Plaintiff's employment, is a member of some of the same protected classes upon which Plaintiff's discrimination claims are predicated. (*See* 56.1 ¶ 3.)

**B.**   **Plaintiff's Retaliation Claims Fail as a Matter of Law**

Plaintiff's NYSHRL and NYCHRL Retaliation Claims allege he was terminated for complaining about discriminatory treatment in July and August of 2019.  (Compl. ¶¶ 62-63.) "[E]ven under the more relaxed NYCHRL standard, when Plaintiff's sole evidence of pretext is the temporal proximity between Plaintiff's complaints and Defendants' discipline, a NYCHRL retaliation claim cannot survive summary judgment if the employer has shown a non-retaliatory reason for the plaintiff's mistreatment."  *Sivio v. Vill. Care Max*, 436 F. Supp. 3d 778, 802 (S.D.N.Y. 2020) (internal quotation marks omitted).  This is particularly true where there is evidence of a "progressive series" of negative performance reviews that began "months before" to the alleged complaint about discriminatory treatment.  *Tomizawa v. ADT LLC*, 2015 WL 5772106, at *7-8 (E.D.N.Y. Sept. 29, 2015) (granting summary judgment on NYSHRL and NYCHRL retaliation claims) (emphasis original).

Given the complete absence of evidence of retaliation in the record, and given Plaintiff's documented negative performance reviews (56.1 ¶¶ 17-22 (December 2018 negative year-end review), 23-28 (June 2019 negative mid-year review)), his NYSHRL and NYCHRL Retaliation Claims cannot survive summary judgment.

**III.**
**SUMMARY JUDGMENT SHOULD BE GRANTED ON**
**PLAINTIFF'S HOSTILE WORK ENVIRONMENT CLAIMS**

Plaintiff also asserts hostile work environment claims under the NYSHRL and the NYCHRL on the basis of religion, national origin, and race. (Counts 9-12). Even under the highly liberal standard that applies to these claims, they all fail as a matter of law.

"[T]he NYCHRL is not a 'general civility code,'" and "[i]t is not enough that a plaintiff has an overbearing or obnoxious boss." *Mihalik*, 715 F.3d at 108 (citation omitted). For a hostile work environment claim to survive summary judgment, a plaintiff must establish "facts tending to show that actions that created the hostile work environment were taken against him because of a prohibited factor." *Harris v. NYU Langone Med. Ctr.*, 2013 WL 3487032, at *27 (S.D.N.Y. July 9, 2013).

Moreover, conduct must be severe and pervasive to constitute a hostile work environment under the NYSHRL. Negative reviews, removal of supervisory responsibilities, loss of a private office, reduced responsibilities and exclusion from meetings do not suffice. *See Harewood v. N.Y.C. Dep't of Educ.*, 2021 WL 673476, at *13 (S.D.N.Y. Feb. 22, 2021) (negative performance reviews); *Villar v. City of N.Y.*, 135 F. Supp. 3d 105, 132 (S.D.N.Y. 2015) (removal of supervisory responsibilities and reassignment from private office); *Davis-Molinia v. Port Auth. of N.Y. & N.J.*, 2011 WL 4000997, at *11 (S.D.N.Y. Aug. 19, 2011) ("diminished [job] responsibilities" and "exclu[sion] from staff meetings"), *aff'd*, 488 F. App'x 530 (2d Cir. 2012) (summary order). A plaintiff cannot "string" together "discrete claims of discrimination and retaliation . . . and call that a 'hostile work environment.'" *Modica v. N.Y. City Dep't of Educ.*, 2021 WL 3408587, at *7 (S.D.N.Y. Aug. 4, 2021) (Furman, J.).

There is no evidence to support Plaintiff's allegation that he was treated worse than other LAM employees because of his membership in any protected class. For that reason

21

alone, summary judgment should be granted as to Plaintiff's NYCHRL Hostile Work Environment Claims.  *See Ferraro v. N.Y. City Dep't of Educ.*, 404 F. Supp. 3d 691, 720 (E.D.N.Y. 2017), *aff'd*, 752 F. App'x 70 (2d Cir. 2018); *see also Fleming v. MaxMara USA, Inc.*, 644 F. Supp. 2d 247, 269 (E.D.N.Y. 2009) (granting summary judgment "notwithstanding the NYCHRL's more lenient standard for hostile work environment claims" where plaintiff had "not established an adequate basis permitting a trier of fact to infer that the alleged discriminatory conduct was motivated by plaintiff's race"), *aff'd*, 371 F. App'x 115 (2d Cir. 2010).

Moreover, the factual allegations underlying Plaintiff's Hostile Work Environment claims are identical to those that underlie his discrimination and retaliation claims, which he cannot prove.  *See supra* Sections I and II.  For that additional reason, the Court should grant summary judgment.

Lastly, Plaintiff's NYSHRL Hostile Work Environment claim should be dismissed for the additional, independent reason that none of the alleged conduct is sufficiently severe or pervasive to constitute a hostile work environment under the NYSHRL.  *See Harewood*, 2021 WL 673476, at *13; *Villar,* 135 F. Supp. 3d at 132; *Davis-Molinia*, 2011 WL 4000997, at *11.

**IV.**
**SUMMARY JUDGMENT SHOULD BE GRANTED AS TO**
**PLAINTIFF'S CLAIMS FOR BACKPAY AND/OR FRONTPAY DAMAGES**

Plaintiff seeks $948,333.05 in lost income damages, $14,225 in "inflation" damages, and $45,467 in interest.  (56.1 ¶¶ 50-54.)

"Courts have the power to separate the issues of liability and damages and grant summary judgment as to either."  *Cardwell*, 2023 WL 2049800 at *37.  "A plaintiff seeking frontpay or backpay damages under . . . the NYSHRL[] or the NYCHRL has a duty to mitigate."

*Cardwell*, 2023 WL 2049800 at *37; *see also Cooper v. N.Y. State Nurses Ass'n*, 847 F. Supp. 2d 437, 452 (E.D.N.Y. 2012) (same for FMLA).

"Generally, an employer seeking to avoid a lost wages award bears the burden of demonstrating that a plaintiff has failed to satisfy the duty to mitigate" by "establishing (1) that suitable work existed, and (2) that the employee did not make reasonable efforts to obtain it." *Broadnax v. City of New Haven*, 415 F. 3d 265, 268 (2d Cir. 2005) (quoting *Dailey v. Societe Generale*, 108 F.3d 451, 456 (2d Cir. 1997)).  But an exception to this general rule applies by which "an employer 'is released from the duty to establish the availability of comparable employment if it can prove that the employee made no reasonable efforts to seek such employment.'"  *Id.* (quoting *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 54 (2d Cir. 1998)).  "When deciding whether a plaintiff attempted to mitigate her damages, the 'ultimate question is whether the plaintiff acted reasonably in attempting to gain other employment or in rejecting proffered employment.'"  *Arbercheski v. Oracle Corp.*, 650 F. Supp. 2d 309, 313 (S.D.N.Y.2009) (quoting *Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684, 695 (2d Cir. 1998)).

"[A]ssessment of the reasonableness of a plaintiff's effort to mitigate" includes analysis of "the quantity and quality of the particular measures undertaken by the plaintiff to obtain alternate work."  *Dailey v. Societe Generale*, 108 F.3d 451, 456 (2d Cir. 1997).  A plaintiff fails to make reasonable efforts to seek employment where they "take no steps to pursue employment comparable to the positions" they previously held.  *Arbercheski v. Oracle Corp.*, 650 F. Supp. 2d 309, 314 (S.D.N.Y. 2009).  A plaintiff also fails to make reasonable efforts where they engage in only limited efforts to gain employment, such as reviewing newspaper classifieds and contacting former colleagues.  *See Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 2015 WL 13699239, at *3-4 (S.D.N.Y. Mar. 25, 2015).

23

No reasonable jury could conclude that Plaintiff's job search constituted a reasonable effort to mitigate.  First, there is no evidence that Plaintiff made any meaningful affirmative efforts to find a new job.  The only evidence he produced shows that his search consisted of responding to *inbound* inquiries from headhunters, indicating "interest" in positions on LinkedIn, and submitting a single application to Wells Fargo.  (56.1 ¶¶ 60-61.)  There is no evidence he networked or undertook any good faith efforts to secure new employment in the course of a nearly three-year period of unemployment (which continues to this day).

Second, the evidence shows that Plaintiff did not seek *comparable* employment. Instead, he expressly limited his search to positions far beyond what his experience could possibly have warranted.  Over and over, he told those headhunters that reached out to him that he would consider only positions paying seven-figure compensation or "executive leadership" roles that would give him a "Chief" title.  (*See* 56.1 ¶¶ 55-59.)  But Plaintiff had never earned such compensation—the most he ever earned at LAM was $320,000—and he had never held a "Chief" title at LAM or anywhere else (notwithstanding his false representation on his LinkedIn profile that he is currently the "Global Head of Fixed Income, FX & Alt. Investments Trading Technology at LAM).  (56.1 ¶ 13.)  In short, Plaintiff did not even attempt a reasonable search for comparable employment, and his efforts to mitigate therefore are insufficient as a matter of law.  The Court therefore should grant summary judgment on his requests for frontpay and/or backpay, including associated "inflation" damages and interest.[4]

---

[4] For the reasons detailed in Defendants' contemporaneously filed motion for sanctions, Defendants respectfully request that the Court (i) preclude Plaintiff from presenting any evidence of his damages, and (ii) apply an adverse inference in adjudicating Defendants' motion for summary judgment as to Plaintiff's failure to mitigate damages, and presume any evidence regarding his employment search that Plaintiff improperly failed to produce during discovery would have been harmful to his claims.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court enter summary judgment in their favor on all claims in this action, and grant such other and further relief as the Court deems just and proper.


Dated: New York, New York
        August 7, 2023

                                        Respectfully submitted,

                                        FRIEDMAN KAPLAN SEILER
                                          ADELMAN & ROBBINS LLP

                                        *S/ Lance J. Gotko*
                                        Lance J. Gotko
                                        Anne E. Beaumont
                                        Matt Tharp
                                        7 Times Square
                                        New York, NY  10036
                                        (212) 833-1100
                                        lgotko@fklaw.com
                                        abeaumont@fklaw.com
                                        mtharp@fklaw.com

                                        *Attorneys for Defendants*