UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
                                  :

MANMOHAN UTTARWAR,             :

                       *Plaintiff*,    :      No. 1:22-cv-8139 (JMF)

                                    :

       - against -             :

                                    :

LAZARD ASSET MANAGEMENT LLC, and  :
KERI TUSA,                       :

                                    :

                    *Defendants*.   :

                                    :
---------------------------------------------------------------x

### PLAINTIFF'S RULE 56.1 STATEMENT OF DISPUTED MATERIAL FACTS IN RESPONSE TO DEFENDANTS' RULE 56.1(a) STATEMENT OF <u>MATERIAL FACTS</u>

Plaintiff Manmohan Uttarwar, by and through his counsel, Ballon Stoll P.C. submits this Statement of Disputed Material Facts, pursuant to Local Rule 56.1, in response to Defendants' Statement of Material Facts:

<u>Relevant LAM Individuals</u>

1.      Plaintiff Manmohan Uttarwar was hired as a Senior Vice President, Senior Trading Technology Engineer at LAM from May 14, 2018 until his employment was terminated on September 25, 2019 during a reduction in force.  (Ex. 4 at -7733; Ex. 7 at -6484.)

**Plaintiff's Response: Admit.**

2.      Keri Tusa was Director - Global Head of Trading Technology at LAM and Plaintiff's direct supervisor from June 18, 2018 until the date Plaintiff's employment at LAM was terminated.  (Tusa Decl. ¶¶ 3, 6.)  Tusa reported to Vijay Kasarabada.  (Kasarabada Decl. ¶ 4.) Tusa began her employment at LAM in June 2018.  (Tusa Decl. ¶ 3.)

**Plaintiff's Response: Deny in part. Tusa was hired as Plaintiff's supervisor on or about June 15, 2018. Ex. 1 ¶ 9.**

3.      Kasarabada was the Chief Technology Officer at LAM during the time period Plaintiff was employed at LAM.  (Kasarabada Decl. ¶ 2.)  Kasarabada is originally from India and identifies as Asian Indian.  (Kasarabada Decl. ¶¶ 11.)

**Plaintiff's Response: Admit.**

4.      John LaBadia was a Senior Vice President at LAM during the time period  Plaintiff was employed at LAM.  (Tusa Decl. ¶ 5.)  LaBadia was Plaintiff's supervisor during the first month Plaintiff was employed at LAM.  (Tusa Decl. ¶ 5.)  LaBadia began reporting to Tusa on or around June 18, 2018.  (Tusa Decl. ¶ 5.)

**Plaintiff's Response: Deny in part; see response to ¶ 2.**

Plaintiff's Hiring at LAM

5.      On April 23, 2018, Plaintiff was offered the position of "Senior Vice President, Senior Trading Technology Engineer" at LAM with an annual salary of $200,000.  (Ex. 4 at -7733.)

**Plaintiff's Response: Admit that was the base salary.**

6.      Kasarabada was the hiring manager for the Senior Vice President, Senior Trading Technology Engineer role that Plaintiff was offered.  (Kasarabada Decl. ¶ 3; Ex. 6 at -778.)

**Plaintiff's Response: Deny in part: Plaintiff was hired prior to Kasarabada's hiring. (Ex. 1 ¶ 9).**

7.      Plaintiff's employment offer letter included a $60,000 bonus for calendar year 2018 if Plaintiff did not resign and was not terminated during calendar year 2018, as well as an additional discretionary bonus.  (Ex. 4 at -7733.)

**Plaintiff's Response: Admit.**

8.      Plaintiff accepted LAM's employment offer on April 24, 2018.  (Ex. 4 at -7737.)

**Plaintiff's Response: Admit.**

9.      Plaintiff began employment at LAM on or around May 14, 2018.  (Ex. 4 at -7733.)

**Plaintiff's Response: Admit.**

Plaintiff's Prior Employment and Education

10.     Plaintiff's LinkedIn profile states that he has a MS degree in Industrial Engineering from Kansas State University.  (Ex. 5 at 5; *see also* Compl. ¶ 37 ("Plaintiff had multiple Master's degrees relating to software and business while, upon information and belief, LaBadia had only a Bachelor's Degree").)

> **Plaintiff's Response: Deny in part to clarify: Plaintiff, as noted on his LinkedIn profile, holds a Master's Degree in Software Engineering ("MSE"). He had completed the educational hourly equivalent of multiple Master's Degrees relating to software and business, including 75 completed credit hours at Kansas State University, composed of: the aforementioned MSE, the requisite 30 credit hours for completion of a Master's in Industrial Engineering ("MIE"), and the remaining credits in Business School coursework. (Ex. 3 at 31:19-32:23, 34:11-14, 117:22-118:16; Ex. 1 ¶ 22-23).**

11.     Plaintiff does not have a master's degree in Industrial Engineering from Kansas State University.  (Ex. 1 at 118:5-11.)

> **Plaintiff's Response: Deny. See response to ¶ 10.**

12.     Plaintiff does not have multiple master's degrees relating to software and business. (Ex. 1 at 31:19-25.)

> **Plaintiff's Response: Deny. See response to ¶ 10.**

13.     Plaintiff has never held a position with the title of Chief Technology Officer, Chief Information Officer, Head of Trading Technology, or Managing Director ("MD") of Trading Technology.  (Ex. 5.)

**Plaintiff's Response: Admit as to the exact titles but deny with regard to responsibilities.**

Plaintiff's Employment at LAM

14.     On June 18, 2018, shortly after she began supervision Plaintiff, Tusa wrote an email to Plaintiff stating that she looked "forward to getting to know you better and building a successful future together."  (Tusa Ex. 1, LAM_0017544.)

**Plaintiff's Response: Admit that Tusa sent that email at the very beginning of Plaintiff's employment.**

15.     Plaintiff testified that in or around October 2018, Tusa approved Plaintiff's request for vacation in India to celebrate the Hindu festival of Diwali with his parents.  (Ex. 1 at 41:18-42:19.)

**Plaintiff's Response: Admit with the clarification that this approved request permitted Plaintiff, who is of Asian Indian race, to visit his parents in his place of origin, India, in order to celebrate Diwali in observance of his Hindu religion. Tusa knew Plaintiff was a Hindu from India. (Ex. 2 at 40:20-43:3; 56.1 ¶ 15; Ex. 1 ¶ ¶ 4-6, 35-37.)**

16.     Shortly after Plaintiff began employment at LAM, Kasarabada and Tusa began encountering issues with Plaintiff's performance, including a failure to communicate effectively with Tusa and difficulties arising from Plaintiff's interactions with internal LAM colleagues and

external LAM stakeholders including LAM vendors.  (Kasarabada Decl. ¶ 5; Tusa Decl. ¶¶ 16-17.)

**Plaintiff's Response: Deny.**

Plaintiff's Negative 2018 End-of-Year Review

17.     In December 2018, Plaintiff received a negative end-of-year review.  (Tusa Ex. 2, LAM_0017696.)

**Plaintiff's Response: Admit.**

18.     Plaintiff was rated "Below Expectations" in all review categories.  (Tusa Ex. 2, LAM_0017696.)

**Plaintiff's Response: Deny in part to clarify that the evaluation made no sense since Plaintiff had just received ample and global praise from numerous high-ranking LAM executives, including an email from the LAM Chief Operating Officer ("COO"), Norbert Rustler, as well as from multiple LAM divisions, and from Heads of Trading Desks who controlled the book of business worth billions of dollars and who were Plaintiff's internal clients, for successfully delivering LAM's Fixed Income Trading System migration from the Charles River System to the Bloomberg System. (Ex. 2; Ex. 1 ¶ 39-40). Likewise, Tusa had just received an email from Joe Ramos, the Managing Director of US Fixed Income, which expressed extreme approval of Plaintiff's work performance. (Ex. 4; Ex. 1 ¶ 40). Plaintiff had also received abundant praise from clients that were stored in an LAM database, that Tusa should have referenced for her evaluation. Ex. 1 ¶ 40.**

19.     Below Expectations was the lowest possible score on LAM's 2018 performance assessment scale.  (Tusa Ex. 2, LAM_0017696.)

**Plaintiff's Response: Admit but reassert response to ¶ 18.**

20.     Plaintiff's 2018 end-of-year review stated that he should "be thoughtful as to whether or not he can add additional insight, and when another attendee has adequately explained the issue," because restatement could lead to a "situation that people are a bit irritated, as they already understood it in the first place."  (Tusa Ex. 2, LAM_0017697.)

**Plaintiff's Response: Deny in part, reasserting response to ¶ 18 and asserting that these statements are not reflective of anything indicating poor job performance.**

21.     Plaintiff's 2018 end-of-year review also stated that Tusa needed "to see execution from start to finish on tasks" and that Plaintiff should "select and solve for 2-3 key issues, before spending time engaging with every team."  (Tusa Ex. 2, LAM_0017696.)

**Plaintiff's Response: Deny in part to clarify that a statement about what an employee should do is not a statement that an employee has failed to do something. Importantly, Tusa's negative evaluation in December of 2018 was submitted as one of nine (9) reviews forming Plaintiff's 2018 end-of-year review, and each of the other eight (8) reviewers rated Plaintiff as either meeting or exceeding expectations. (Ex. 6; Ex. 1 ¶ 41-42). The intensity of this role required Plaintiff to sometimes work past 4:00 a.m. and while on vacation. (Ex. 22; Ex. 23; Ex. 1 ¶ 52). In such a role, Plaintiff did not have the luxury to choose "2-3" projects to focus on. Nobody could anticipate what issues propped up on a daily basis; thus, Plaintiff needed to maintain his attention on protecting the firm's revenue and mitigating any and all**

**compliance issues with extremely tight timelines, where delays of even minutes could**

**affect hundreds of thousands of dollars' worth of firm profits. (Ex. 1 ¶ 53)**

22.     On July 31, 2019, Tusa communicated to Katelyn Del Valle that Plaintiff "got a

below in *all areas* for his end of year review" and Kelly Sliger "thought we might have enough

documentation to let [Plaintiff] go."  (Tusa Ex. 10, LAM_0017347.)

**Plaintiff's Response: Admit that these things were discussed between those parties**

**within approximately one month of Plaintiff's complaint about discrimination.**

Plaintiff's Negative June 2019 Mid-Year Review

23.     Plaintiff received a negative 2019 mid-year review in June 2019.  (Tusa Ex. 7,

LAM_0017701.)

**Plaintiff's Response: Admit that this negative review, based on false and baseless**

**criticism by Tusa and otherwise contradicted by rave reviews from peers and clients**

**for excellent performance, existed. (Ex. 1 ¶¶ 67-68.) Deny that this review was either**

**fair or accurate. The 2019 review not only lacked any other reviewers (unlike the end-**

**of-year 2018 review), but it also contained a category for the other reviewers with a**

**blank for where their review scores should have been entered. This review deviated**

**from company protocol which required eight (8) "360" reviewers in addition to the**

**review of the direct manager (Tusa). This evaluation was only by Tusa, who was the**

**one (1) reviewer out of nine (9) from 2018 who had given Plaintiff an unfavorable**

**review in 2018 and who, in doing so, had substantially diverged from the scores of the**

**other eight (8) reviewers in 2018.**

24.     Plaintiff received a Below Expectations rating in his 2019 mid-year review.  (Tusa

Ex. 7, LAM_0017701.)

**Plaintiff's Response: Admit but see response to ¶ 23.**

25.    At the time of Plaintiff's 2019 mid-year review, "there [were] always many fires" Tusa had to fight after Plaintiff interacted with other LAM employees or external LAM vendors. (Tusa Ex. 7, LAM_0017701.)

**Plaintiff's Response: Deny as to this fragment being taken out of context, mischaracterizing Plaintiff's excellent performance. (Ex. 1 ¶ 73)**

26.    At the time of Plaintiff's 2019 mid-year review, Plaintiff "ha[d] not checked in code, released new projects, or developed applications." (Tusa Ex. 7, LAM_0017702.) Tusa had "repeatedly asked Manmohan to roll up his sleeves and write code. There ha[d] been 0% execution on this." (Tusa Ex. 7, LAM_0017702.) Plaintiff was the only member of Tusa's team not to report the results of Business Continuity and Disaster Recovery tests to Tusa by the cutoff time, which unnecessarily delayed the release of the LAM IT Business Continuity and Disaster Recovery test results. (Tusa Ex. 7, LAM_0017701.)

**Plaintiff's Response: Admit the words in the review but deny their truth. Plaintiff frequently executed on writing and checking code, released new projects, and developed applications. (Ex. 1 ¶ 76) All of the projects Plaintiff delivered needed coding to get to the enormous amounts of logical data access, system navigation, and automation contributing to thousands of lines of code over the term of his employment. Deny that Plaintiff had anything to do with the delay, which resulted from a LAM system issue on LAM's (CyberArk) System / Servers / Network (titled "issue #105" in email correspondence with Tusa), carried over from the 2018 testing of former LAM employee Derek Rae who left LAM in July 2018. (Ex. 1 ¶ ¶ 78-79)**

27.     At the time of Plaintiff's 2019 mid-year review, Tusa had "received complaints from business stakeholders across many areas (Portfolio Management, Operations, Legal) about Manmohan's overcomplication of even the most straight-forward tasks."   (Tusa Ex. 7, LAM_0017702.)

**Plaintiff's Response: Deny. Plaintiff never received any complaints or other negative feedback from business stakeholders concerning overcomplication of simple issues. (Ex. 1 ¶ 80)**

28.     In the 2019 mid-year review, Plaintiff judged his work performance to "Significantly Exceed" expectations; and in the portion of the review entitled "Less of This," designed as a place where employees could self-evaluate performance areas where they could improve, Plaintiff instead wrote out a list of areas where he said LAM was deficient.  (Tusa Ex. 7, LAM_0017701.)

**Plaintiff's Response: Admit that Plaintiff's work performance significantly exceeded expectations, deny that Plaintiff chose not to self-evaluate. Plaintiff was on CFA L2 Exam Study leave in June 2019 which Tusa had approved. It was not until Plaintiff returned from said leave that he found out about the mid-year 2019 review and that the deadline to submit a self-review had already passed. Plaintiff got an extension from Human Resources to complete the form. (Ex. 1 ¶ ¶ 83- 84)**

2019: Plaintiff Does Not Provide Tusa With an Accurate List of Projects

29.     Plaintiff stated he worked on 30 projects in the self-review component of his 2019 mid-year review in June 2019.  (Tusa Ex. 7, LAM_0017702.)

**Plaintiff's Response: Admit that upon his return, Plaintiff compiled all the requisite project details, and shared the details of the projects he had delivered to internal clients to Tusa. (Ex. 1 ¶ 85)**

30.     These projects were not shared with Tusa prior to Plaintiff's 2019 mid-year review. (Tusa Ex. 7, LAM_017701.)

**Plaintiff's Response: Deny. Plaintiff always kept Tusa informed via emails about all of his individual projects as they were happening during the course of the year. Tusa therefore was aware of the number, status, and details of all of these projects delivered by Plaintiff in 2019. (Ex. 1 ¶ 86)**

31.     Tusa previously requested a list of ongoing work projects from Plaintiff.  (Tusa Ex. 7, LAM_017701.)

**Plaintiff's Response: Deny. Tusa had never previously requested a list of ongoing work projects from Plaintiff. (Ex. 1 ¶ 87)**

32.     Plaintiff did not provide a list of work projects to Tusa when requested.  (Tusa Ex. 8, LAM_0017408.)

**Plaintiff's Response: Deny. See responses to ¶ 30 and 31.**

33.     All other employees reporting to Tusa provided work projects lists when requested, including in June and July of 2018.  (Tusa Ex. 8, LAM_0017408.)

**Plaintiff's Response: Deny any independent knowledge of this.**

34.     On July 8, 2019, Plaintiff emailed Tusa and Kasarabada a list of work projects that he stated he had completed.  (Tusa Ex 9, LAM_0017461.)

**Plaintiff's Response: Deny to the characterization of this being an isolated email. See response to  ¶ 30.**

35.     On August 16, 2019, Plaintiff emailed a list of projects to Tusa and others that he stated he was working on.  (Tusa Ex. 9, LAM_0017465.)

**Plaintiff's Response: Plaintiff's Response: Deny to the characterization of this being an isolated email. See response to ¶ 30.**

36.     On August 30, 2019, Plaintiff provided a status update on the projects listed in his August 16, 2019 email.  (Tusa Ex. 9, LAM_0017461.)

**Plaintiff's Response: Plaintiff's Response: Deny to the characterization of this being an isolated email. See response to ¶ 30.**

37.     On September 3, 2019, Tusa forwarded Plaintiff's August 30, 2019 status update to Ms. Del Valle, Ms. Sliger, and Kasarabada.  (Tusa Ex. 9, LAM_0017461.)  Most of the projects listed by Plaintiff were completed by others, completed after business users called Tusa to express frustration, or projects that Plaintiff refused to listen to Tusa's prioritization on.  (Tusa Ex. 9, LAM_0017461.)

**Plaintiff's Response: Admit that on September 3, 2019, the first day of Plaintiff's approved parental leave, Tusa sent an email containing false and frivolous criticisms of Plaintiff's performance. All of the projects Plaintiff emailed Tusa about were completed by Plaintiff, not by others, while working directly with the business users who were pleased with Plaintiff's efficiency, speed, and performance. Plaintiff was never made aware by anyone at the firm or outside the firm of any incidents of business users expressing frustration towards the projects he completed. (Ex. 1 ¶¶ 99-100)**

<u>Plaintiff's Approved Paid Parental Leave</u>

38.     On August 16, 2019, Plaintiff was offered paid parental leave "for up to 20 weeks if you are the primary caregiver[] or up to 4 weeks if you are the non-primary caregiver."  (Sliger Ex. 1, LAM_0015995.)

**Plaintiff's Response: Admit that the period of Plaintiff's approved FMLA parental leave was from September 3, 2019 to October 29, 2019. (Ex. 1 ¶ 96)**

39.     LAM offers an employee who is the primary caregiver of a newborn 20 weeks of paid parental leave in lieu of the unpaid leave available under the Family Medical Leave Act ("FMLA").  As permitted by law, LAM's leave policy requires that employees who qualify for paid parental leave also take unpaid FMLA leave concurrently.  (Sliger Decl. ¶ 4; Sliger Ex. 1, LAM_0015995.)

**Plaintiff's Response: Admit that the period of Plaintiff's approved FMLA parental leave was from September 3, 2019 to October 29, 2019. (Ex. 1 ¶ 96)**

40.     On August 16, 2019 Plaintiff returned his "Parental Leave Request and/or Change Form" to LAM and was approved for 8 weeks of paid leave beginning on September 3, 2019, with a second 12 week segment to be taken at a later to be determined time.  (Ex. 14, LAM_0017769.)

**Plaintiff's Response: Admit that the period of Plaintiff's approved FMLA parental leave was from September 3, 2019 to October 29, 2019. (Ex. 1 ¶ 96)**

Plaintiff's Reduction in Force Termination

41.     On September 25, 2019, Plaintiff was informed his employment at LAM was terminated.  (Ex. 7 at -6484.)

**Plaintiff's Response: Admit that this termination happened over the phone while Plaintiff was on approved parental leave.**

42.     Plaintiff's position was terminated as part of a reduction in force at LAM that impacted over 50 other LAM employees including three other IT employees in addition to Plaintiff.  (Sliger Decl. ¶¶ 7-8; Sliger Ex. 2, LAM_0017673; Sliger Ex. 3, LAM_0017491.)

**Plaintiff's Response: Deny that reduction was the reason for Plaintiff's termination since LaBadia was not terminated. (Ex 1 ¶ 103)**

43.     Plaintiff was selected for termination in the reduction in force because of his poor performance evaluations and poor work performance.  (Kasarabada Decl. ¶ 9; Tusa Decl. ¶ 35.)

**Plaintiff's Response: Deny, see responses to ¶ 42, ¶ 28, ¶ 37.**

44.     Kasarabada and Tusa made the decision to terminate Plaintiff's employment as part of the reduction in force.  (Kasarabada Decl. ¶ 9; Tusa Decl. ¶ 35.)

**Plaintiff's Response: Deny, see response to ¶ 42.**

45.     On September 25, 2019, Plaintiff wrote an email to Vijay Kasarabada regarding his termination.  (Ex. 7, LAM_0016484.)  Plaintiff did not allege he was discriminated against by anyone at LAM in the September 25, 2019 email.  (Ex. 7, LAM_0016484.)

**Plaintiff's Response: Admit that Plaintiff refrained from calling out LAM's discrimination because he was purposely being as respectful and professional as possible to try and save his job. (Ex. ¶ 104)**

46.     On September 27, 2019, Plaintiff sent an email to LAM employees stating that their "testimonial for [him] would be greatly appreciated."  (Ex. 3.)  Plaintiff asked LAM employees to write an email to Vijay Kasarabada and Kelly Sliger with the subject line "Testimonial for Manmohan Uttarwar."  (Ex. 3.)

**Plaintiff's Response: Admit that truthful testimony is appreciated by Plaintiff.**

47.     Plaintiff was offered a severance payment consistent with the firm's severance formula for the 2019 RIF after his termination.  (Sliger Decl. ¶ 9; Ex. 8 at -7706.)  The severance offered by LAM included payment of Plaintiff's salary through October 29, 2019, when Plaintiff's paid parental leave was scheduled to end.  (Tusa Ex. 1, LAM_0017486.)

**Plaintiff's Response: Admit but deny that Plaintiff's termination was lawful or proper.**

48.     From November 8, 2019 to September 14, 2021, Plaintiff sent more than twenty emails to employees of LAM's Human Resources department rejecting the offered severance payment and attempting to negotiate it.  (Ex. 8, LAM_0017705; Ex. 9, LAM_0017746; Ex. 10, LAM_0017748; Ex. 11, LAM_0017740.)

**Plaintiff's Response: Admit but deny that Plaintiff's termination was lawful or proper or that negotiation reflects on any wrongdoing on Plaintiff's part.**

49.     None of Plaintiff's emails attempting to negotiate his severance alleged he was discriminated against.  (Ex. 8, LAM_0017705; Ex. 9, LAM_0017746; Ex. 10, LAM_0017748; Ex. 11, LAM_0017740.)

**Plaintiff's Response: Admit that Plaintiff showed restraint in asserting the true reason for his termination in an effort to show respect to his place of employment.**

Plaintiff Fails to Mitigate Damages

50.     Plaintiff has stated he seeks total damages of $1,025,362.00.  (Ex. 13.)

**Plaintiff's Response: Admit.**

51.     Plaintiff seeks damages of $948,333.05 based on lost income and lost bonus payments from September 25, 2019 to present.  (Ex. 13.)

**Plaintiff's Response: Admit.**

52.     Plaintiff seeks $50,000 in emotional distress damages.  (Ex. 13.)

**Plaintiff's Response: Admit.**

53.     Plaintiff seeks $14,225 in "inflation/cost of living adjustment" damages.  (Ex. 13.)

**Plaintiff's Response: Admit.**

54.     Plaintiff seeks $45,467 in interest.  (Ex. 13.)

**Plaintiff's Response: Admit.**

55.    On at least 14 occasions after his termination from LAM, Plaintiff told recruiters that he was not interest in positions with compensation below seven-figures or positions other than "executive leadership" roles.  (Ex. 12 at MU_000041 (January 25, 2021 email stating "I have had people reach out to me for roles ranging up to $5.0 Million so far.  I would like to entertain roles with similar comps, exposure & profile."); *id.* at MU_000094 (September 2, 2021 email stating Plaintiff "will be looking for Comps in $ Millions"); *id.* at MU_000076 (January 11, 2022 email stating Plaintiff was "Looking for total comps in Seven figures"); *id.* at MU_000047 (January 22, 2022 email stating "I am looking for CTO or Global head of Trading Technology or Global head of a vertical in Trading Technology with TC $1M+."); *id.* at MU_000081 (February 4, 2022 email stating "Looking for total comps in Seven figures only"); *id.* at MU_000073 (February 18, 2022 email stating "open to new executive level technology roles like a CTO/CIO/Global Head/Head of Trading or Trading Technology" and "Looking for a total comps in Seven figures only"); *id.* at MU_0000068 (April 13, 2022 email stating "Looking for a total comps in Seven figures only"); *id.* at MU_000036 (May 5, 2022 email stating "we need the comps in $Ms & not $Ks"); *id.* at MU_000030 (June 16, 2022 email stating "Looking for a total comps in 7-Figures only"); *id.* at MU_000054 (October 11, 2022 email stating "Looking for a total comps in Seven figures only"); *id.* at MU_000057 (October 11, 2022 email stating "You were going to come back with more updates regarding their max Comp Flexibility ranges in the 7-Figures"); *id.* at MU_000013 (October 26, 2022 email stating "Looking for a total comps in Seven figures"); *id.* at MU_000052 (December 12, 2022 email stating "I will be looking for "Executive Leadership" roles only"); *id.* at MU_000003 (June 9, 2023 email stating "looking for a total comp in Seven Figures").)

**Plaintiff's Response: Plaintiff's philosophy while searching for new employment has been as follows: At LAM, an approximately $300 Billion AUM firm in 2019, he was already acting as a Global Head of Trading Technology for Fixed Income, FX & Alternative Investments. Based on his research, Plaintiff concluded that he was severely underpaid for his position at LAM; the titles and roles he was targeting were already publicly posted in Seven Figures in average, 50th, 75th & 90th percentile columns. Plaintiff wanted to be paid fairly and commensurate to his value and experience. So he was upfront about what he wanted with recruiters so both sides invested time on roles that were pertinent from a title and compensation perspective. (Ex. 1 ¶¶ 108-109)**

56.    On January 27, 2022, Plaintiff received an email from a recruiter regarding a position as Head of FX Technology at Truist Bank.  (Ex. 12 at MU_000083.)  On January 28, 2022, Plaintiff responded "As a Global Head of Technology (FI, FX & Alt Invmt) for a $300 Billion AUM firm, heading $80 Billion AUM Technology, do you think this new role you reach out to me would be a good fit – Level wise?"  (*Id.* at MU_000083.)

**Plaintiff's Response: Deny the characterization , see response to ¶55.**

57.    On June 13, 2022, a recruiter sent an email to Plaintiff regarding a Manager of Application Development position and wrote "[t]hey'll pay anywhere up to 400-500 K total compensation for the right candidate."  (*Id.* at MU_000031.)  On June 16, 2022, Plaintiff's reply stated he was "[l]ooking for a total comps in 7-Figures only."  (*Id.* at MU_000030.)  On June 21, 2022, the recruiter replied "My account manager asked them if they would consider a 7 figure salary and they said no, that is to[o] high for them.  As the team is 5 + people I think you are too

senior for this position." (*Id.* at MU_000030.)  Plaintiff replied "We must advocate for ourselves & ask for what we deserve.  Explain to them that you need to incentivize these talent in the marketplace for you to be able to bring high value talent." (*Id.* at MU_000030.)

**Plaintiff's Response: Deny the characterization , see response to ¶55.**

58.     On October 26, 2022, a recruiter sent Plaintiff an email regarding a senior engineer position with an expected salary of "~$350k+" (*Id.* at MU_000014.)  Plaintiff replied that he "would be open to new executive level technology roles like a CTO/CIO/Global Head/Head of Trading Technology or MD of Trading Technology" and that he was "[l]ooking for a total comps in Seven figures." (*Id.* at MU_000013.)

**Plaintiff's Response: Deny the characterization , see response to ¶55.**

59.     On November 29, 2022, a recruiter emailed Plaintiff regarding a "Leadership Job Opportunity" at Ripple.  (*Id.* at MU_000052.)  On December 12, 2022, Plaintiff responded to the November 29, 2022 email and wrote "I am sure you saw my title Global head of Technology for Fixed Income, FX & Alternative Investments @ Lazard which is $300 Billion AUM firm.  So I wanted to make sure before we invest time on both ends.  I will be looking for 'Executive Leadership roles only.'" (*Id.* at MU_000052.)

**Plaintiff's Response: Deny the characterization , see response to ¶55.**

60.     Plaintiff has not initiated communication with recruiters to seek employment since his employment at LAM was terminated, instead relying on recruiters to contact him.  (Ex. 2 at 29:17-21.)

**Plaintiff's Response: Admit that exit resources from LAM, which would have helped Plaintiff find a new job, were contingent on Plaintiff signing a separation agreement containing a release of legal claims against LAM, which Plaintiff refused to sign.**

61.     Plaintiff has indicated he is "interested" in positions on LinkedIn, and applied to a position at Wells Fargo, and has not otherwise initiated communication with employers to seek employment since his employment at LAM was terminated.  (Ex. 2 at 29:22-30:16; 31:3-20.)

**Plaintiff's Response: Admit that job openings for comparable roles to the role Plaintiff had at LAM that were open to candidates outside the company were typically not publicly posted. Instead, candidates were selected by the outreach efforts of recruiters. Plaintiff therefore primarily corresponded with recruiters who had reached out to him on LinkedIn. However, Plaintiff did also affirmatively apply to companies whenever he saw the job posting for a comparable role on LinkedIn. (Ex. 1 ¶ 106)**

John LaBadia's Employment at LAM

62.     At the time of Plaintiff's termination, LaBadia supervised three LAM employees, and Plaintiff did not supervise any LAM employees.  (Tusa Decl. ¶ 7; Tusa Ex. 8, LAM_0017408.)

**Plaintiff's Response: Deny. Plaintiff and LaBadia held virtually identical roles at LAM as Front Office SVPs reporting equally to Tusa. Ex. 1 ¶ 14.**

63.     LaBadia met expectations in the majority of categories in his 2018 year-end review. (Tusa Decl. ¶ 8.)

**Plaintiff's Response: Deny independent knowledge of this.**

64.     LaBadia exceeded expectations in his 2019 mid-year review.  (Tusa Decl. ¶ 8.)

**Plaintiff's Response: Deny independent knowledge of this.**

65.     LaBadia provided a list of ongoing projects to Tusa when requested.  (Tusa Decl. ¶ 9.)

**Plaintiff's Response: Deny independent knowledge of this.**

66.     Tusa did not receive complaints about LaBadia from any LAM vendors or other external contacts he interacted with.  (Tusa Decl. ¶ 10.)

**Plaintiff's Response: Deny independent knowledge of this.**

67.     Tusa did not receive complaints about LaBadia from other LAM employees who LaBadia interacted with in the LAM Technologies department or in other LAM departments supported by LAM Technologies.  (Tusa Decl. ¶ 11.)

**Plaintiff's Response: Deny independent knowledge of this.**

68.     LaBadia followed Tusa's instructions regarding prioritization of projects.  (Tusa Decl. ¶ 12.)

**Plaintiff's Response: Deny independent knowledge of this.**

69.     LaBadia regularly contributed to the LAM Technologies department by producing working code, completing assigned projects, and developing applications at the request of LAM users.  (Tusa Decl. ¶ 13.)

**Plaintiff's Response: Deny independent knowledge of this.**

70.     LaBadia began working at LAM in 2003.  (Sliger Decl. ¶ 3.)

**Plaintiff's Response: Deny independent knowledge of this.**

**Additional statements of material fact**

71.     In or about April of 2019, Tusa removed Plaintiff's direct subordinates, including Plaintiff's quintessential subordinate—the Vice President of Plaintiff's department—from under Plaintiff's command. Ex. 17; Ex. 18; Ex. 19; Ex. 20; Ex. 1 ¶ 56. This deprived Plaintiff of a key resource of Plaintiff's team and severely inhibited Plaintiff's ability to manage a workload involving twice as many business trading desk units as LaBadia's despite LaBadia possessing approximately twice as many support staff as Plaintiff. Ex. 1 ¶ 57.

72.     Between approximately May and August of 2019, Tusa intentionally excluded Plaintiff from approximately twenty-nine (29) key executive meetings he was scheduled to attend. Ex. 1 ¶ 58.

73.     Approximately sixteen (16) of these meetings were "Lead Level Meetings" where the top executives of Plaintiff's department, including Front Office SVPs, would meet and exchange vital information for the management functions of each executive at the meeting, including for the Front Office SVPs. Ex. 1 ¶ 59.

74.     Tusa excluded Plaintiff from these Lead Level Meetings by lying to him about their date and time. Ex. 1 ¶ 60.

75.     LaBadia was not excluded from these Lead Level Meetings. Ex. 1 ¶ 61.

76.     Approximately thirteen (13) of the key executive meetings that Tusa excluded Plaintiff from were one-on-one meetings that Tusa was required to schedule with each SVP under her—including Front Office SVPs—to discuss vital information for the SVP's job functions. Ex. 1 ¶ 62.

77.     While Tusa consistently afforded LaBadia the benefit of these one-on-one meetings, Tusa canceled or perpetually pushed off approximately thirteen (13) out of approximately sixteen (16) of these meetings scheduled with Plaintiff between May and August of 2019 and thereby denied Plaintiff the benefit afforded to LaBadia of these consistent one-on-one meetings and the vital information shared therein. Ex. 1 ¶ 63-64.

78.     By constantly excluding Plaintiff from these key executive meetings and denying Plaintiff the critical job information shared therein for months at a time, Tusa rendered Plaintiff's job exponentially more difficult, stressful, and demanding, and inhibited Plaintiff's ability to perform his job duties. Ex. 1 ¶ 65.

79.     Despite these extreme handicaps, Plaintiff still greatly outperformed LaBadia resulting in numerous reports from clients and peers about Plaintiff's excellent performance. Ex. 24; Ex. 25; Ex. 1 ¶ 66.

Dated: New York, New York
        October 13, 2023

BALLON STOLL P.C.

By:____s/Marshall Bellovin____
Marshall Bellovin, Esq. (MB5508)
*Attorneys for Plaintiff*
810 Seventh Avenue, Suite 405
New York, New York 10019
212-575-7900
